October 14, 2022

**Supreme Court**

No. 2020-168-M.P.
(WC 11-615)
No. 2020-169-M.P.
(WC 11-616)

Champlin's Realty Associates      :

v.      :

Coastal Resources Management      :
      Council et al.

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Champlin's Realty Associates  :

v.  :

Coastal Resources Management  :
    Council et al.

Present: Suttell, C.J., Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.** On October 19, 2020, this Court granted

two petitions for writ of certiorari filed by the plaintiff, Champlin's Realty

Associates (Champlin's), and we issued writs to review a June 17, 2020 judgment

of the Superior Court "affirm[ing] in all respects the May 6, 2011 decision and the

September 27, 2013 decision" of the Rhode Island Coastal Resources Management

Council (the CRMC). The effect of the Superior Court judgment is to deny

Champlin's application, originally filed in 2003, to expand its marina on the Great

Salt Pond in the Town of New Shoreham.[1]

On December 15, 2020, Champlin's sought from this Court an extension of

time to submit its statement required by Article I, Rule 12A of the Supreme Court

---

[1] The Town of New Shoreham comprises the entire area of Block Island.

Rules of Appellate Procedure, for the reason that it was engaged in mediation with the CRMC. Shortly thereafter, on January 8, 2021, Champlin's and the CRMC filed a motion seeking to "incorporate and merge" a Joint Memorandum of Understanding (the MOU) "into a consent order of this Court." Under its terms, the MOU purports to "serve as the CRMC's Decision relative to this matter."

The intervenors, the Town of New Shoreham (the town), the Committee for the Great Salt Pond, the Block Island Land Trust, the Block Island Conservancy, and the Conservation Law Foundation (collectively the intervenors), as well as the Rhode Island Attorney General (the attorney general), contested the propriety of the purported settlement and the validity of the MOU. We remanded the matter to the Superior Court for findings of fact and conclusions of law concerning the "propriety and conclusiveness" of the purported settlement and the validity of the MOU. On remand, the Superior Court held several hearings and issued a written decision.

For the reasons set forth herein, we affirm the decision and resulting June 17, 2020 judgment of the Superior Court, and we deny the request by Champlin's and the CRMC to incorporate and merge the MOU into a consent order of the Supreme Court.

# I

## Facts and Travel

In a state that proudly calls itself the Ocean State, it is perhaps not surprising that an application to expand a marina would generate intense public interest. Rhode Island measures only forty-eight miles from north to south and thirty-seven miles from east to west, yet it boasts 400 miles of shoreline. The fondness of Rhode Islanders for the ocean is indeed visceral and is reflected in such activities as swimming, fishing, sailing, surfing, motorboating, kayaking, quahogging, and simply viewing its breathtaking beauty. The right to enjoy many such activities was originally set forth in the Royal Charter of 1663 and is now enshrined in the state's constitution. R.I. Const., art. 1, § 17.

The obligation of protecting Rhode Island's marine resources falls primarily on the CRMC, as does the challenging task of balancing the myriad interests in and to the tidal waters and adjacent upland areas. In light of the many competing activities and the intense public interest which they generate, it is of the utmost importance that the CRMC operate under a clear set of parameters. These parameters are provided by the enabling statutes creating the CRMC (G.L. 1956 chapter 23 of title 46), its own rules and regulations, and the overarching framework of the Administrative Procedures Act (the APA) (G.L. 1956 chapter 35 of title 42). With these principles in mind, we embark upon our review.

### *Champlin's I*

The travel of this case spans nearly two decades, and the facts concerning the origin of the case and the first phases of the litigation can be found in this Court's opinion in the case of *Champlin's Realty Associates v. Tikoian*, 989 A.2d 427 (R.I. 2010) (*Champlin's I*). We refer the interested reader to that previous opinion for a recitation of the facts and travel leading up to the issuance of that opinion, and we confine ourselves herein to only those facts that are relevant to the present writs of certiorari.

Champlin's "operates a large marina on Block Island serving the needs of boaters and their craft."[2] *Champlin's I*, 989 A.2d at 431. In 2003, Champlin's filed an application with the CRMC to extend its existing marina 240 feet into the Great Salt Pond, in order to accommodate 140 additional boats. *Id.* "The proposed expansion included 2,990 feet of fixed pier and an additional 755 feet of floating docks"; "[u]nder the proposal, the additional dockage would extend from the existing marina." *Id.* The intervenors formally opposed the application, thereby making the proceeding a "contested case[]" under the CRMC Management Procedures, to be heard by a "duly authorized and appointed [s]ubcommittee." *Id.*

---

[2] At oral argument, counsel for Champlin's indicated that Champlin's had been sold to new owners, but he maintained that the sale has no bearing on the issues before this Court.

On January 10, 2006, following twenty-three hearings, the CRMC subcommittee "made forty-seven findings of fact and issued a recommendation with three votes in favor of a scaled-down modification of the proposal" that would result in a 170-foot expansion—rather than a 240-foot expansion—and one vote against. *Champlin's I*, 989 A.2d at 432, 433. Ultimately, five members of the full CRMC voted to approve the subcommittee's recommendation, and five members voted against approval; the resulting tie vote constituted a rejection of the subcommittee's recommendation. *Id.* at 433.

Champlin's thereafter filed an administrative appeal with the Superior Court in accordance with the APA, § 42-35-15, seeking review of the CRMC's decision rejecting its application. *Champlin's I*, 989 A.2d at 433. The trial justice made extensive factual findings and credibility determinations regarding the testimony of the witnesses during sixteen evidentiary hearings, a show-cause hearing regarding this Court's decision in *Arnold v. Lebel*, 941 A.2d 813 (R.I. 2007)—a case that clarifies what *ex parte* communications are proscribed under the APA—and a limited hearing as to the disqualification of subcommittee member Gerald P. Zarrella. *See Champlin's I*, 989 A.2d at 434-35.

Based on her findings, the trial justice held that (1) Champlin's substantial rights had been prejudiced by the subcommittee's consideration of an "off-the-record" "compromise plan" (the Goulet plan) promoted by then-CRMC

chairman Michael Tikoian and subcommittee member Paul E. Lemont after the subcommittee hearings were completed; (2) the CRMC's decision was made upon unlawful procedure and in excess of its statutory authority; and (3) Champlin's substantial rights had been violated when two of the council members—Tikoian and Lemont—voted at the full council hearing despite what the trial justice viewed as their demonstrated bias against the application. *Champlin's I*, 989 A.2d at 435, 436, 438. The trial justice ultimately found that members Tikoian, Lemont, and Zarella should not have taken part in the CRMC decision with respect to Champlin's application. *Id.* at 435.

The trial justice thereafter declined to remand the case to the CRMC for further proceedings because, according to the justice, it would result in further delay in Champlin's efforts to obtain a decision on its application. *Champlin's I*, 989 A.2d at 436. Instead, in reliance on *Acierno v. Folsom*, 337 A.2d 309 (Del. 1975), the trial justice "simply subtracted the votes of the three disqualified members from the five to five tie vote rendered at the CRMC full council meeting." *Id.* Accordingly, the trial justice reconfigured the final vote of the full council to four-to-three in favor of adopting the subcommittee recommendation, finding that such a determination was "supported by the reliable, probative, and substantial evidence of record." *Id.* at 436-37. On April 20, 2009, the CRMC, Tikoian, and the intervenors sought review

- 6 -

of the Superior Court's decision by petition for certiorari, which this Court granted. *Id.* at 437.

In the resulting opinion in *Champlin's I*, we first addressed Champlin's challenge to standing. *Champlin's I*, 989 A.2d at 437. This Court held that, "[w]e are of the opinion that Tikoian, the CRMC, and the intervenors are all aggrieved parties within the statute and, therefore, properly are before this Court." *Id.* at 438. Specifically, the Court concluded that the intervenors had established that they were aggrieved by a final judgment in accordance with § 42-35-16(a), noting that the Superior Court's "substitution of the CRMC decision with the subcommittee recommendation left the intervenors with no avenue of review except through the discretionary writ of certiorari." *Id.*

This Court additionally held that the trial justice erred when she subtracted the disqualified votes and elevated the subcommittee recommendation to a CRMC decision. *Champlin's I*, 989 A.2d at 442. Rather, the Court held that, in light of this Court's opinion in *Arnold*, the only appropriate remedy was to remand the matter to the CRMC "for supplementation of the record with the *ex parte* communications to be included to allow the parties to appropriately respond and cross-examine." *Id.* Accordingly, the Court remanded the case to the Superior Court with instructions to

remand the matter to the CRMC for further proceedings consistent with the opinion.[3] *Id.* at 450.

## Post-*Champlin's I* Proceedings

The case was then remanded to the CRMC, and three hearings were conducted between May and July 2010, followed by briefing by all parties. On January 11, 2011, the CRMC held a hearing and rendered a decision on Champlin's application. Seven members were present, and each member attested to having read "all of the documents that have been engendered over the years of the deliberation of this matter." Counsel for the CRMC then reviewed the status of the CRMC's previous decision and summarized the charge to the members. Each of the seven CRMC members present then offered specific comments on Champlin's application.

In addition, the members offered comments on the location of "Mooring Field E." The town utilizes Mooring Field E for rental moorings for transient boaters; it is located northeast of Champlin's marina. In 1988, the United States Army Corps of Engineers granted the town a permit to establish Mooring Field E with a capacity of eighty moorings; in 1995, it approved the town's application to expand Mooring Field E to an area that surrounded the existing marina and to increase its mooring

---

[3] We note that in *Champlin's Realty Associates v. Tikoian*, 989 A.2d 427 (R.I. 2010) (*Champlin's I*), this Court addressed further issues beyond what we have discussed herein; we address only those rulings that are relevant to our review relating to the present writs of certiorari.

capacity to one hundred. In 1991, the CRMC approved—and the town adopted—the first Harbor Management Plan (the 1991 plan), which identified the rental mooring field as Mooring Field E; its configuration reflected an "imperfect triangular shape, with its southern border situated one hundred feet from the outermost dock of Champlin's Marina and a portion extending around the western boundary of Champlin's Marina, forming a so-called lobe."

In 1999, the town submitted a new Harbor Management Plan to the CRMC (the 1999 plan), which "did not alter or otherwise reconfigure Mooring Field E from that which was plotted and approved in the 1991 [p]lan." After it was submitted by the town to the CRMC for review and approval, the 1999 plan was not reviewed until 2003, when Champlin's application at issue in these cases was filed. This was "[b]ecause Champlin's application, in part, sought to expand into the adjacent Mooring Field E and/or to relocate certain rental moorings." The CRMC therefore consolidated the two matters—Champlin's application and the town's proposed 1999 plan.

On remand, the members unanimously voted to deny Champlin's application for a proposed expansion plan into the Great Salt Pond. The members also unanimously voted to adopt the location of Mooring Field E so as to allow a 300-foot fairway from Champlin's existing structure to Mooring Field E, an increase from an existing one-hundred-foot fairway, and to eliminate the lobe that was situated to the

west of Champlin's existing dock. The CRMC then issued a written decision on May 6, 2011, containing ninety-one findings of fact and ten conclusions of law.

Champlin's filed two complaints in Providence County Superior Court: (1) on February 4, 2011, appealing the oral vote of the CRMC denying Champlin's application on January 11, 2011, and (2) on June 1, 2011, appealing that oral vote and the CRMC's May 6, 2011 written decision.[4] Additionally, the town filed a complaint against the CRMC in Washington County Superior Court on May 19, 2011, appealing the portion of the May 6, 2011 written decision of the CRMC mandating that, "Mooring Field E must be drawn so as to allow a 300 foot-wide navigational channel between the mooring field and Champlin's marina *as well as the other existing marinas in the* [*Great Salt Pond*]." The three cases were consolidated by the Presiding Justice of the Superior Court, and venue was designated as Washington County.[5]

In its memorandum before the Superior Court, Champlin's compared the CRMC's treatment of Champlin's expansion to that of its neighbor, Payne's Dock, alleging disparate treatment. The cases were then remanded "to the CRMC for a

---

[4] The defendants named in Champlin's Superior Court complaints are the members of the CRMC in their official capacities; the CRMC; and the intervenors, namely: the Town of New Shoreham, the Committee for the Great Salt Pond, the Block Island Land Trust, the Block Island Conservancy, and the Conservation Law Foundation.
[5] Upon transfer, Champlin's two administrative appeals were assigned Washington County case numbers; therefore, PC 11-661 became WC 11-615 and PC 11-3130 became WC 11-616.

second time for the presentation of evidence into whether Champlin's received disparate treatment from the CRMC." Four evidentiary hearings were held before the CRMC on the matter; and, on September 27, 2013, the CRMC issued its written decision comparing the two marinas and concluding that there was a rational basis for the CRMC's denial of Champlin's application and the approval of Payne's Dock's application.

While on remand, the CRMC additionally addressed and modified its May 6, 2011 decision concerning the configuration of Mooring Field E, noting a discrepancy between the CRMC's oral vote and the written decision. The CRMC ordered that Mooring Field E "shall be situated 300 feet off of all three marinas (Payne's, Block Island Boat Basin, and Champlin's) in order to provide for a 300-foot-wide fairway"; the town thereafter withdrew its Superior Court appeal.

The cases were thereafter returned to the Superior Court, and the parties filed additional memoranda addressing the September 2013 CRMC decision.

A second trial justice ultimately issued a written decision on February 11, 2020, affirming "in all respects the May 6, 2011 decision and the September 27, 2013 decision of the CRMC."[6] The trial justice found that there was legally sufficient evidence in the record to support both the CRMC's denial of Champlin's

---

[6] We note that the trial justice filed a lengthy and meticulous decision approximately six years after the parties filed their memoranda. The record contains no explanation for the lapse of time, and we are troubled by the seemingly unwarranted delay.

application to expand its marina and the CRMC's determination that there were significant differences in the applications filed by Champlin's and Payne's Dock. The trial justice held that the CRMC had acted within its authority in denying Champlin's application and that the agency's decision was "rational, logical, and supported by substantial evidence." The court concluded that "Champlin's rights have not been prejudiced by any constitutional violations, error of law, or arbitrary or capricious conduct on the part of CRMC."

Judgment entered in favor of the CRMC and the intervenors on June 17, 2020.

### Proceedings on Certiorari in this Court

Champlin's thereafter filed petitions for writs of certiorari on July 1, 2020, which were opposed by the intervenors and the CRMC. The petitions were granted, and the writs issued on October 19, 2020.

On January 8, 2021, Champlin's and the CRMC filed a joint motion seeking to "incorporate and merge" the MOU "into a consent order of this Court[,]" the MOU having been arrived at by the two moving parties—Champlin's and the CRMC—in the context of a private mediation.[7] The intervenors and the attorney general—the latter official having moved successfully to intervene "for the sole and limited

---

[7] The MOU is dated December 29, 2020. The proposed consent order document that the movants seek to have entered has never been filed with this Court.

- 12 -

purpose of opposing" the joint motion—filed memoranda in opposition to the joint motion.

On March 26, 2021, this Court denied the joint motion and ordered Champlin's to file a statement pursuant to Article I, Rule 12A of the Supreme Court Rules of Appellate Procedure within twenty days, which Champlin's did.

On May 13, 2021, Champlin's filed a motion for remand to the Superior Court, to which the intervenors and the attorney general objected; on June 10, 2021, the CRMC submitted a memorandum in support of Champlin's motion for remand. On June 11, 2021, this Court granted Champlin's motion and remanded the matter "to the Superior Court for findings of fact and conclusions of law concerning the 'propriety and conclusiveness' of the purported settlement and the validity of the MOU." The Court further ordered that the matter "be returned to this Court no later than ninety (90) days from the date of this Order."

**The Remand Hearings in Superior Court**

On remand, a third justice of the Superior Court (the remand justice) held several evidentiary hearings to allow for findings of fact and conclusions of law. A written decision was issued on September 9, 2021, wherein the remand justice stated that he had

> "established a three-phase procedure in order to gather the necessary information to follow the Supreme Court's order. The first phase was for the proponents of the MOU to present evidence about what happened surrounding the

- 13 -

> mediation and the execution of the MOU; the second phase was for the opponents to present witnesses and evidence questioning what happened; and the third phase was for the proponents to present rebuttal evidence."

The remand justice then set forth approximately forty-five pages of factual findings. He began by reviewing the circumstances surrounding the ultimate formation of the MOU, and he additionally summarized the testimony of the witnesses and assessed their credibility. The remand justice then made conclusions of law regarding the propriety and conclusiveness of the settlement between Champlin's and the CRMC and the validity of the MOU itself.

The remand justice began his analysis by addressing whether the CRMC had the authority to mediate with Champlin's. He noted the strong public policy in favor of settlements and this Court's support of mediation and alternative dispute resolution. He further stated that, once an agency's decision is challenged (by appeal in the court system under the APA), the agency's role changes from that of an adjudicator to that of an advocate before the judiciary; he determined that the "CRMC became a party to the appeal in the Superior Court" and that, therefore, the "CRMC and Champlin's, as two parties, could enter settlement discussions and proceed to mediation." Indeed, the remand justice found that the CRMC was not precluded by state law or by its own regulations to resolve cases through mediation, citing § 46-23-20 and 650 RICR 10-00-1.8(C). The remand justice was additionally persuaded by the United States Supreme Court's opinion in *Local Number 93 v. City*

- 14 -

*of Cleveland*, 478 U.S. 501 (1986); the remand justice found that, under the reasoning in that case, "the [i]ntervenors do not have the ability to block the mediated settlement itself, but * * * the [i]ntervenors have the right to notice and an opportunity to be heard before the MOU is ratified or adopted[.]"

The remand justice then addressed the issue of notice to the intervenors. He found that, because mediation is "extra-judicial" and "very informal[,]" it does not require formal notice. He then determined that "sufficient, actual notice was given[,]" identifying the four ways in which he found that the intervenors had been notified of the mediation.

Finally, the remand justice considered "whether entry of final judgment in accord with the MOU is appropriate." On that issue, he determined that, although the intervenors "do not have the authority to block a mediated settlement[,]" a "fairness hearing" should be held in accordance with *Local Number 93*, to give the intervenors an "opportunity to present evidence and have their objections heard."

On September 14, 2021, Champlin's moved on an emergency basis for further remand for a "fairness hearing," which was supported by the CRMC; the intervenors and the attorney general objected to the motion for further remand. The papers were returned to this Court from the Superior Court on September 20, 2021. On October 15, 2021, we entered an order which (1) added the Superior Court record of the

remand proceedings to the record previously certified by the Superior Court on certiorari and (2) denied Champlin's emergency motion for further remand.

## II

## Standard of Review

The APA, G.L. 1956 chapter 35 of title 42, governs the Superior Court's review of an administrative appeal. Section 42-35-15(g) of the APA sets forth that:

> "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
> "(1) In violation of constitutional or statutory provisions;
>
> "(2) In excess of the statutory authority of the agency;
>
> "(3) Made upon unlawful procedure;
>
> "(4) Affected by other error of law;
>
> "(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
>
> "(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."

The APA also limits this Court's review of the Superior Court's judgment in administrative proceedings. Section 42-35-16 (governing review by this Court of judgments entered pursuant to § 42-35-15). "In conducting such a review, we are

- 16 -

restricted to questions of law, which we review *de novo*." *Champlin's I*, 989 A.2d at 437 (citing *Rossi v. Employees' Retirement System of Rhode Island*, 895 A.2d 106, 110 (R.I. 2006)). "The factual findings of the administrative agency are entitled to great deference." *Id.* "However, when the review of the trial court's decision is conducted under a writ of certiorari, as it is here, 'this Court applies the some or any evidence test and reviews the record to determine whether legally competent evidence exists to support the findings.'" *Id.* (brackets omitted) (quoting *Sartor v. Coastal Resources Management Council*, 542 A.2d 1077, 1082-83 (R.I. 1988)).

**III**

**Discussion**

**A**

**The 2020 Decision and Judgment**

We begin our analysis by addressing the issues raised by Champlin's concerning the Superior Court's 2020 judgment and the underlying decision of the trial justice. Before this Court, Champlin's submits that the trial justice committed multiple errors and urges this Court to reverse her decision denying Champlin's appeal and affirming the CRMC's decisions. In its brief, Champlin's first asserts that the subcommittee recommendation issued in January 2006 was not vacated by this Court's opinion in *Champlin's I* and that the recommendation should have "served as the starting point" for the hearings on remand. According to Champlin's,

- 17 -

this error was compounded by the trial justice, who allegedly failed to consider the subcommittee recommendation and instead focused solely on the original application by Champlin's to the CRMC. Finally, Champlin's faults the trial justice's handling of the water quality certificate issue, the mooring field issue, and the issue of disparate treatment, all of which Champlin's suggests warrant reversal. We shall address these issues *seriatim*.

## Subcommittee Recommendation

Champlin's first takes issue with the procedure pursuant to which the CRMC conducted its proceedings after this Court's decision in *Champlin's I*. It argues that the procedure was "unlawful * * * in violation of § 46-23-20.4, clearly erroneous and constituted an arbitrary, capricious abuse of discretion." Most significantly, Champlin's faults the CRMC for rejecting the subcommittee recommendation, ignoring the subcommittee's findings, and disregarding this Court's mandate to "reopen the hearing on the Champlin's application" and expand the record to include the Goulet plan.

Champlin's contends that it was "irrevocably prejudiced" by the following statement by the CRMC's counsel at the outset of the hearing on remand:

> "I think the Supreme Court case law is very clear, that when a matter is remanded to an agency with the hearing of additional evidence * * * that that matter is then heard de novo by the agency, and I stated that on previous occasions. Additionally, I believe the Supreme Court decision invalidated both the full Council decision and the

subcommittee recommendation. So, that being said, hearing the matter de novo, you are here to approve, modify or deny the application filed by Champlin's Realty as well as the request of the Town of New Shoreham for the location of Mooring Field E."

According to Champlin's, the decision in *Champlin's I* did not invalidate the subcommittee recommendation that a 170-foot expansion be allowed rather than the 240-foot expansion as contemplated in the original application. Rather, it provided for an expanded record, which then "should have served as the starting point for these hearings, with due consideration, for the Goulet plan[.]" As a result, the full committee allegedly "ignored virtually all of the findings of the [s]ubcommittee" and considered only the original application.

This error was exacerbated, Champlin's maintains, by the CRMC's failure to comply with § 46-23-20.4(a), which provides:

"Subject to the provisions of this chapter, every hearing for the adjudication of a violation or for a contested matter shall be held before a hearing officer or a subcommittee. The chief hearing officer shall assign a hearing officer to each matter not assigned to a subcommittee. After due consideration of the evidence and arguments, the hearing officer shall make written proposed findings of fact and proposed conclusions of law which shall be made public when submitted to the council for review. The council may, in its discretion, adopt, modify, or reject the findings of fact and/or conclusions of law; provided, however, that any modification or rejection of the proposed findings of fact or conclusions of law shall be in writing and shall state the rationales therefor."

In her decision, the trial justice commented:

- 19 -

> "The clear mandate by the Supreme Court on remand to the CRMC was to expand the record to include all previously impermissible *ex parte* communications, including the Goulet plan, allow cross-examination by any party on such additional testimony or evidence, and render a decision based upon the entire record—the subcommittee and workshop records, supporting data, supplementary material and, naturally, the records of all proceedings before the full Council. * * * The CRMC did just that."

We agree.

In *Champlin's I*, the Court returned the case to the Superior Court with directions to remand the matter to the CRMC to reopen the hearings and expand the record to include the Goulet plan and all supporting materials. *Champlin's I*, 989 A.2d at 449, 450. The matter was to be heard by the then-members of the CRMC, provided that each voting member certify that he or she had read the entire record. *Id.* at 449. Clearly the mandate required the CRMC to consider Champlin's application in a *de novo* manner. *See Hagopian v. Hagopian*, 960 A.2d 250, 253 (R.I. 2008) (referring to the obligation of the lower court to implement the letter and spirit of the mandate of the appellate court).

The Court also emphasized in *Champlin's I* that "the subcommittee simply is not authorized under the CRMC Management Procedures to render a decision for the CRMC. The subcommittee recommendation remained just that, a mere recommendation to the full council." *Champlin's I*, 989 A.2d at 448. However, the

subcommittee findings and recommendation were a part of the record. As counsel for the CRMC advised the members:

> "[T]he members having read the entire record and having the complete record before them, if any of the findings of either the previous full Council's decision or the subcommittee recommendation still have vitality to them, they are certainly free to adopt those as their own findings."

Based upon our review of the record, we are satisfied that the CRMC appropriately implemented both the letter and spirit of this Court's mandate in *Champlin's I*. As the Court observed, the record upon which the subcommittee recommendation was based was not complete because the "impermissible *ex parte* information" was not made available for the examination of the parties. *Champlin's I*, 989 A.2d at 449. We also find it significant that, at the full council hearing on February 28, 2006, the CRMC failed to adopt the subcommittee recommendation in a tie vote. *Id.* at 433. To be sure, two members of the CRMC voting thereon—one voting in favor of adoption and one against—were subsequently disqualified because of bias. *Id.* at 433, 435.[8] Nevertheless, the "tie vote constituted a rejection of the recommendation." *Id.* at 433.

---

[8] In *Champlin's I*, this Court observed that the trial justice determined that three members of the CRMC should have been disqualified due to bias. *Champlin's I*, 989 A.2d at 435. The Court, however, held that the trial justice's finding of bias as to one of the members was not based on legally competent evidence. *Id.* at 447-48. As a result, this Court held that only two of those three members had been properly disqualified. *Id.* at 444.

- 21 -

Also, we discern no error in the CRMC's failure to state its rationale for rejecting the subcommittee's findings of fact in writing as required by § 46-23-20.4(a). As noted *supra*, the subcommittee findings at issue were predicated upon an incomplete record and were "reject[ed]" by a tie vote of the full CRMC. *Champlin's I*, 989 A.2d at 433. More significantly, the Court's opinion in *Champlin's I* provided that:

> "[T]his case should be returned to the Superior Court with an order that that tribunal remand the matter to the CRMC. That body should be ordered to expeditiously reopen the hearing on the Champlin's application. The record is to be expanded to include the Goulet plan and all supporting materials." *Id.* at 449.

It is patently evident from that language that such proceedings were to transpire before the full CRMC and not the subcommittee. Thus, it was not necessary for the subcommittee to consider the new evidence and perhaps reassess its recommendation. The remand further permitted all members of the CRMC to vote on Champlin's application, but only on the condition that each member "certify that he or she has read the entire record before the council, including the transcripts of the subcommittee hearings and workshop[.]" *Champlin's I*, 989 A.2d at 449. In accordance with the remand instructions, therefore, each voting member was aware of the subcommittee's findings and the underlying evidence, but the members were not required to give deference to such findings.

Moreover, in accordance with the remand order, the CRMC rendered a decision containing ninety-one findings of fact and ten conclusion of law that comprehensively set forth its rationale for denying Champlin's application.

Champlin's repeatedly emphasizes that "the Superior Court's examination of the record was focused, almost exclusively on the original application[,]" notwithstanding the fact that Champlin's "specifically adopted the recommendation of the subcommittee." The record reveals, however, that the original application was never withdrawn or amended. Indeed, the record suggests that agendas for the CRMC meetings at which Champlin's application was heard referred to the original application.[9]

---

[9] For example, at the January 11, 2011 CRMC meeting, the agenda item read as follows:

> "**Application before the Full Council in accordance with Remand Order from the Rhode Island Supreme and Superior Courts and Continuance Order issued on November 18, 2010:**

> "**2003-05-155  CHAMPLIN'S REALTY ASSOCIATION** -- Expansion of existing marina facility consisting of an additional 2,990 linear feet of fixed pier, and 755 linear feet of floating docks, with corresponding expansion of existing marina perimeter limit (area) by approximately 4 acres, however, it should be noted that the requested marina perimeter limit ('MPL') seeks approximately 13 acres. The stated increase in marina capacity is 140 boats. Additionally, this matter was consolidated with the Town of New Shoreham's request for CRMC approval of its Harbor Management Plan. The Harbor Management Plan

## Water Quality Certificate

Champlin's next ascribes error to the trial justice's determination that the water quality certificate issued by the Rhode Island Department of Environmental Management (DEM) was not the controlling authority with respect to all issues concerning water quality. It argues that "the trial justice overlooked the evidence that it is the practice of CRMC to rely on the DEM water quality certificate and not issue [its] own certificate[,]" a practice that, Champlin's asserts, has been codified in § 46-23-6(1)(iv):

> "* * * all plans and programs shall be developed around basic standards and criteria, including:
>
> "* * *
>
> "(D) Water quality standards set by the director of [DEM]."

Under the Rhode Island Coastal Resources Management Program (CRMP), CRMP § 300.1 sets forth eleven requirements that Champlin's had to satisfy to obtain a Category B Assent, one of which was to "demonstrate that there will be no significant deterioration in the quality of the water in the immediate vicinity as

issues were limited to the location and size of Mooring Field E. Project to be located at plat 19, lots 5 and 6; West Shore Road, New Shoreham, RI."

defined by DEM[.]" CRMP § 300.1(8).[10]   Other requirements, however, also concern issues of water quality, such as:

> "(5) demonstrate that the alteration or activity will not result in significant impacts on the abundance and diversity of plant and animal life[;]"
>
> "* * *
>
> "(7) demonstrate that the alteration will not result in significant impacts to water circulation, flushing, turbidity, and sedimentation[.]" CRMP § 300.1(5), (7).

When confronting this issue, the trial justice stated that "[t]he criteria that Champlin's is required to satisfy for a Category B assent includes several distinct areas which all deal with water quality in different ways[.]"  She further noted that the CRMC's decision addressed the interplay between a water quality certificate issued by DEM and the CRMC's approval process.  The council emphasized in its decision that the "CRMC's review regarding water quality issues is independent and broader than DEM's review of water quality issues[,]" and that the issuance of a DEM water quality certificate does not resolve all issues associated with water quality.

---

[10] In the CRMC's May 6, 2011 decision, it is stated that "[t]he applicable provisions of the Coastal Resources Management Program ('CRMP') are Sections 120, 200.3, 300.1, 300.4, and 335."  In the trial justice's 2020 written decision, she also confirmed that the CRMC's May 6, 2011 decision identified, and the parties did not dispute, that sections 200.3, 300.1, 300.4, and 335 of the CRMP were applicable.

In *Milardo v. Coastal Resources Management Council of Rhode Island*, 434 A.2d 266 (R.I. 1981), this Court stressed that very point; there, an applicant seeking to build a summer home challenged the requirement that the plan for sewage disposal had to be reviewed by two agencies—the Rhode Island Department of Health (DOH) and the CRMC. *Milardo*, 434 A.2d at 267, 272. The Court emphasized that the "Legislature could have assigned both functions to the same agency[, but] [i]n choosing not to do so, the Legislature doubtless considered the need for special types of expertise in the discharge of the separate but similar functions of both agencies." *Id.* at 273. Although DOH had conditionally approved the proposed sewage disposal system, the CRMC denied the application; and this Court stated that "this result derived from the distinct functions of these tribunals as was implicit in the [DOH's] requirement that [the applicant] present his [or her] plan to the council." *Id.* at 267, 268, 273.

In *New Castle Realty Company v. Dreczko*, 248 A.3d 638 (R.I. 2021), the Court grappled with a similar issue wherein the plaintiff, after receiving a DEM permit to alter freshwater wetlands, filed an application with the municipal zoning board for a special-use permit to install a septic system within one hundred feet of wetlands and for a dimensional variance from requirements for house placement on a parcel. *New Castle Realty Company*, 248 A.3d at 640-41. The zoning board denied the application for both a special-use permit and a dimensional variance. *Id.* at 641.

- 26 -

The plaintiff appealed the zoning board's denial, contending, *inter alia*, that the standard to approve a special-use permit was *ipso facto* satisfied by DEM's approval. *Id.* However, the zoning board contended that DEM's approval did not require the zoning board to grant a special-use permit. *Id.* at 642.

In *New Castle Realty Company*, we explained that, "[w]hile both DEM and zoning boards address public interest considerations, not every standard set forth in the zoning ordinance is pertinent to what must be considered by DEM in granting or denying a permit—DEM and zoning boards each serve separate functions." *New Castle Realty Company*, 248 A.3d at 644. We also held, however, that the zoning board lacked the specialized knowledge necessary to refute DEM's decisions; we determined therefore that "an applicant for zoning relief ought to be able to rely on permits granted by DEM with respect to those matters uniquely within DEM's expertise." *Id.* at 645, 646.

Unlike in *New Castle Realty Company*, where DEM's findings were not expressly contradicted, in the case at bar the trial justice held that not only did CRMP § 300.1 provide for separate and distinct criteria that Champlin's was required to satisfy in addition to the water quality certificate issued by DEM, but also the CRMC had found that the surveys offered by Champlin's professional wetland scientist, Scott Rabideau, were incomplete. The CRMC emphasized that Rabideau's shellfish survey did not include sampling points within the area of the proposed expansion

- 27 -

and also the "survey was conducted at a time of year when shellfish would not be expected to be found," thus requiring a follow-up survey. The trial justice noted that the CRMC had faulted Champlin's for "failing to conduct the follow up surveys that Rabideau himself opined were necessary[.]" Specifically, the trial justice stated that the water quality certificate issued by DEM "did not fill the void that was left when he failed to complete the surveys as he said needed to be done to address the skewed results based upon the time of the year that he had conducted his survey."

The trial justice cited to other competent evidence, including the testimony of a DEM witness that revealed the narrower focus of DEM's review. Angelo Liberti, who was, at that time, Chief of the Office of Water Resources within DEM, testified that a water quality certificate focuses primarily on "complying to anti-degradation," which he described as looking at a change in water quality. Liberti further described a model that analyzes the amount of fecal coliform existing in gray water vessel discharge. The trial justice stated in her decision that "DEM's analysis of the number of vessels that will result in a permissible amount of fecal coliform is limited in scope as compared to the CRMP, and specifically the eleven criteria for a Category B assent." For these reasons, we conclude that the trial justice did not err in upholding the CRMC's review of all the evidence and the agency's ultimate determination with respect to water quality that differed from the determination that had been made by DEM.

**Mooring Field E**

Champlin's additionally avers that the trial justice committed reversible error in her findings concerning the impact of Champlin's proposed expansion upon the mooring field. In the context of explaining her conclusion that Champlin's and Payne's Dock were not similarly situated, the trial justice made the following finding of fact: "the evidence of record established that the [t]own would lose up to forty of its rental moorings (from the currently approved one hundred rental moorings) if Champlin's expansion were granted." She based this finding upon the testimony of the CRMC staff engineer Kenneth Anderson before the subcommittee on February 17, 2005.

Champlin's argues that this finding is "simply incorrect and result[s] from [Anderson's] hypothetical statement about fictitious moorings." Anderson testified that Mooring Field E consisted of seven acres and that, if Champlin's application were granted, three of those acres would be eliminated. He further stated that he had seen "diagrams that presented [one hundred] moorings in the field" and that, by eliminating those acres, he would "venture to guess [that forty], [thirty] to [forty] moorings" would be lost.

In a 2013 hearing before the CRMC, Anderson clarified his earlier testimony:

> "The estimate of the number of moorings lost was based on the ratio of how much of the mooring field area was being eliminated by the proposed expansion in the fairway. They weren't actual moorings. The [t]own had

the right to deploy moorings up to within [one hundred] feet of the existing facility, but it did not -- I think your testimony was that the moorings, the closest mooring ball was some [three hundred] feet from Champlin's dock. That was by virtue of the fact that the [t]own didn't exercise its full right to deploy moorings up to within [one hundred] feet of the existing marina. So, all of those moorings that I summarized as being lost, some of them were not actual moorings in the water. They were virtual moorings or potential moorings that the [t]own would have or had the right to install in the previous mooring field."

Champlin's characterizes the finding that the town would lose approximately forty moorings if Champlin's were allowed to expand as arbitrary, capricious, egregious, and clearly erroneous. The relevant findings of the CRMC with respect to rental moorings are as follows:

> "66. Mooring fields and marinas are equally high priority uses in Type 3 waters. Mooring Field E and the Existing Marina are in direct competition for use of the public trust resources of the [Great Salt Pond].

> " * * *

> "70. The [e]xisting [m]arina cannot be expanded further into the waters of the [Great Salt Pond] without significantly affecting and impairing competing uses of the [Great Salt Pond].

> " * * *

> "89. The application if approved would result in an unacceptable impingement on other uses of the public of the [Great Salt Pond] including the [t]own's designated mooring areas.

- 30 -

"90. The application if approved would facilitate only one priority use of Type 3 waters, marinas, while unacceptably restricting another priority use, mooring areas."

In an appeal under the APA, the Superior Court is bound to give deference to the factual findings of the agency unless such findings are clearly erroneous, arbitrary, capricious, or affected by error of law. *See* § 42-35-15(g). Here, the trial justice found "no error in the CRMC's conclusion that Champlin's proposed expansion would negatively infringe upon the [t]own's mooring areas." A review of the record reveals ample support for her conclusions.

When asked if any moorings would have to be removed if Champlin's dock was extended 240 feet seaward, former Harbormaster Steven Land responded, "[a]bsolutely," placing the number at a minimum of forty. Harbormaster Chris Willi testified that more than twenty-three moorings would be lost with the proposed expansion. And it is also worth noting Kenneth Anderson's uncontradicted testimony that approximately three of the seven acres of mooring field would be eliminated.

Whether the moorings Anderson referenced were actual or virtual, Champlin's has not successfully refuted the assertion that its proposed expansion could result in the space for forty moorings being no longer available to the town. We are of the opinion that this constitutes legally competent evidence to support the finding that Champlin's "failed to sustain its burden of proving that its proposed

project will not unreasonably interfere with, impair, or significantly impact existing public uses of, or result in significant conflicts with water-dependent uses and activities in, the [Great Salt Pond]." *See Champlin's I*, 989 A.2d at 437 ("[T]his [C]ourt applies the 'some' or 'any' evidence test and reviews the record to determine whether legally competent evidence exists to support the findings.") (quoting *Sartor*, 542 A.2d at 1082-83).

## Disparate Treatment

Shortly after the CRMC denied Champlin's application, it granted an expansion to Payne's Dock, a neighboring marina that is a competitor of Champlin's in the Great Salt Pond. Champlin's asserted that it was similarly situated to Payne's Dock and that it had received disparate treatment from the CRMC. Champlin's then moved in Superior Court to expand the record or, in the alternative, to have the Superior Court take judicial notice of the CRMC's decision on Payne's Dock. The trial justice treated Champlin's motion as a request for presentation of additional evidence under § 42-35-15(e) and issued an order granting the same. The trial justice then issued a second order requiring the CRMC to accept additional evidence and to consider whether Champlin's and Payne's Dock are similarly situated and whether there was a rational basis for treating its expansion application differently.

Thereafter, the CRMC held four evidentiary hearings and issued a written decision dated September 27, 2013. In its decision, the CRMC found that

Champlin's and Payne's Dock are similarly situated in the following ways: (1) both are located in the Great Salt Pond in the same Type 3 water classification; (2) "[t]hey are in close proximity to one another"; (3) "[t]hey serve the same markets and are business competitors"; (4) "[o]n occasion, they both accommodate large vessels"; (5) "[t]hey are both located proximate to a heavily utilized fairway"; and (6) "[t]hey are both located proximate to the intersection of the fairway and associated navigational channels."

The CRMC also made findings as to how the two marinas are dissimilar: (1) Champlin's fuel pump is located at the end of the marina, whereas Payne's Dock's fuel pump is along the side of the marina; (2) "Champlin's maintains a dinghy dock that provides public access between the shore and vessels moored in the pond"; Payne's Dock does not; (3) "Champlin's is a much larger marina * * *, occupying about three times the amount of acreage and servicing significantly more vessels"; (4) Champlin's dock configuration is not as efficient as Payne's Dock's, resulting in fewer vessels being able to be docked within the area of the marina; (5) "an extension into the pond by Champlin's would have a greater impact on the [t]own's rental mooring field than an extension into the pond by Payne's [Dock]"; and (6) there is "a greater amount of vessel traffic and congestion near Champlin's than exists near Payne's [Dock]."

Concerning the respective applications of the two marinas, the CRMC found: (1) "[b]oth applications were subject to the same standards of review" set forth in the CRMP; (2) "Champlin's application was deemed a 'significant' expansion of an existing marina[,]" and Payne's Dock "was not deemed a 'significant' expansion"; (3) Champlin's was a contested case subject to extensive hearings before a subcommittee, whereas Payne's Dock's application was not contested; (4) "[t]he record reflects no evidence of disparate treatment, bias, procedural inequities, or selective enforcement in the review and consideration of the two applications, notwithstanding the disparate outcomes"; (5) "[w]ith regard to impacts on plant and animal life in the Great Salt Pond: the record associated with the Champlin's application failed to demonstrate that the proposed project would not cause significant impacts[,]" whereas "the record associated with the Payne's [Dock] application showed no evidence that the proposed project would cause significant impacts"; and (6) Champlin's application "failed to demonstrate that the proposed project would not cause significant impacts" to navigation in the Great Salt Pond and "Payne's [Dock's] application showed no evidence that the proposed project would cause significant impacts."

The CRMC concluded that:

> "Based on the application of identical regulatory standards, and based on the significant differences regarding the size of the two marinas, the size of the proposed extensions, the efficiencies of their

- 34 -

configurations, the amount of vessel traffic and congestion that occurs near each facility, the impacts of the proposed expansion on safe navigation within appropriately sized fairways, and the impacts of the proposed expansions on the [t]own's mooring field, the Council finds that there is a rational basis for the denial of the Champlin's application and the approval of the Payne's [Dock] application."

As its final challenge to the Superior Court decision, Champlin's asserts that the trial justice "applied the wrong standard of review to the issue of disparate treatment." It further maintains that "[t]he question of disparate treatment is a mixed question of law and fact" and that the trial justice erred "by declaring that in an agency appeal she was required to 'uphold the CRMC's conclusions if they are supported by legally competent evidence' and that the court 'may not substitute its judgment for that of the CRMC even if this court might be inclined to view the evidence differently and draw inferences different from the CRMC.'" Thus, according to Champlin's, she "erroneously concluded that the two marinas were not similarly situated."

On appeal, Champlin's claims that it was treated arbitrarily by the CRMC and disfavorably in comparison to Payne's Dock. It ascribes fault to the trial justice for not applying a *de novo* standard of review to the issue of disparate treatment.

Champlin's further underscores the similarities between the two marinas and asserts that the trial justice overlooked evidence that "200 feet plus cruise ships regularly docked at Payne's [Dock.]" What is more, it argues that a different

- 35 -

standard was applied to Champlin's concerning the separation between the marinas and the mooring field and the water quality certificate. In addition, it points out that its application was referred to a subcommittee, whereas Payne's Dock's application was not treated as a contested case, even though both applications faced similar objections by "the exact same objectors." Finally, Champlin's argues that the trial justice overlooked the inappropriate *ex parte* communications that plagued its own application. *See Champlin's I*, 989 A.2d at 440-50.

After carefully reviewing the record, we are satisfied that the trial justice undertook the correct steps in analyzing the issue of disparate treatment, and we see no error in the trial justice's analysis. Citing to *Mill Realty Associates v. Crowe*, 841 A.2d 668 (R.I. 2004), the trial justice stated that it was Champlin's burden "to demonstrate that it [was] similarly situated to Payne's Dock and that there was no rational basis for the difference in treatment." In *Mill Realty Associates*, we affirmed a trial justice's decision rejecting the petitioner's claim of selective enforcement and disparate treatment because the petitioner's building permit application was not similarly situated to other applications. *Mill Realty Associates*, 841 A.2d at 675. Under this framework, and looking to the United States Supreme Court's opinion in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000), the trial justice applied a two-part test for a disparate treatment claim: (1) there is intentional and different treatment from others similarly situated, and (2) there is no rational basis for

- 36 -

difference in treatment. *Village of Willowbrook*, 528 U.S. at 564; *see also Cordi-Allen v. Conlon*, 494 F.3d 245, 251 (1st Cir. 2007) ("[P]laintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006))).

"A [trial] justice's findings on mixed questions of law and fact are generally entitled to the same deference as the justice's findings of fact." *Morse v. Minardi*, 208 A.3d 1151, 1155 (R.I. 2019) (quoting *Cummings v. Shorey*, 761 A.2d 680, 684 (R.I. 2000)). "But, when those mixed questions of law and fact impact constitutional matters, we shall review the findings *de novo*." *Id.* (deletion omitted) (quoting *Cummings*, 761 A.2d at 684).

Champlin's has advanced no argument counter to the trial justice's articulation of the law governing a disparate treatment claim. Rather, Champlin's appears to take issue with the CRMC's factual findings and the trial justice's subsequent upholding of those findings. For these reasons, we review Champlin's claims only as they pertain to the trial justice's findings of fact. *See State v. Florez*, 138 A.3d 789, 798 n.10 (R.I. 2016) ("[A] litigant has an obligation to spell out its arguments squarely and distinctly[.]" (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)))).

In her decision, the trial justice reviewed the CRMC's factual findings, concluding that the "two marinas are not similarly situated[.]" She highlighted that Champlin's is a larger facility, "covering almost three times the area that Payne's Dock occupies." She noted that Champlin's application "sought approval for an additional 140 vessels, or between 56[ percent] and 62[ percent] more than its authorized number of vessels[,]" whereas "Payne's Dock only sought approval for an additional fifteen vessels beyond the seventy presently approved, or 21[ percent]."[11] The trial justice noted that Champlin's "sought an additional four acres of Type-3 waters in Great Salt Pond, while Payne's Dock sought only an additional 0.38 acres[,]" observing that "[i]t is abundantly clear that Champlin's Marina is a much bigger operation than Payne's Dock, and the expansion proposed by Champlin's would increase its footprint exponentially as compared to that of Payne's Dock even with Payne's Dock's approved expansion."

Referencing the testimony of various witnesses, the trial justice explained that the location of the two marinas' respective fuel docks contributes to greater congestion in the area of Champlin's fuel dock. She also cited to evidence in the record concerning Champlin's inefficient dock configuration and ultimately stated

---

[11] Champlin's references testimony of Harbormaster Land that, on at least one occasion, Payne's Dock accommodated up to 275 boats, "notwithstanding the application which represented only [seventy]" vessels. Champlin's also represents that Payne's Dock sought an additional eighty-five vessels, although it does not cite to where specifically in the record this figure can be found.

that the evidence presented "establishes the differences in size, navigational impact and congestion, and efficiencies in existing facilities as between the two expansion applications." For example, the trial justice noted Anderson's testimony as it related to Champlin's "inefficient three-pronged, trident [dock] configuration," which differed from Payne's Dock's "simple, rectilinear design[.]" She further touched upon the evidence suggesting that the two applications would have differing impacts on animal and plant life. Regarding Champlin's application, evidence by DEM showed that there were "healthy and productive shellfish resources within the proposed [Champlin's] expansion area[.]" And the CRMC staff biologist testified that there were "'significant impacts' anticipated to shellfish resources within the affected area."

Moreover, Champlin's wetlands scientist had been unable to assuage the CRMC; thus, according to the trial justice, the CRMC had "concluded that there were unresolved issues relating to water quality." On the other hand, a CRMC staff biologist stated with respect to Payne's Dock's application that "[m]inimal impacts are expected on fish, shellfish or wildlife from the proposed seaward expansion which avoids impacts to coastal features and shallow water habitats." Finally, the trial justice remarked that "the evidence of record established that the [t]own would lose up to forty of its rental moorings * * * if Champlin's expansion were granted.

* * * By comparison, Payne's Dock['s] expansion resulted in the loss of only one of the [t]own's rental moorings."

After determining that the CRMC's conclusions were supported by legally competent evidence, the trial justice found that the CRMC did not act arbitrarily or capriciously in its treatment of Champlin's "or that its conclusions and decisions were otherwise erroneous in view of the reliable, probative, and substantial evidence in the whole record." She concluded, "[t]he evidence of record demonstrates that Payne's Dock, while similar in some respects to Champlin's Marina, was dissimilar in important respects which provide a rational basis for the CRMC to reach different results on their respective applications."

We are of the opinion that these findings by the trial justice are not clearly erroneous; rather, the trial justice meticulously combed through the CRMC's findings and found that they were supported by substantial evidence in the record. Accordingly, we conclude that the trial justice did not misconceive or overlook material evidence, and we therefore uphold the 2020 decision and resulting judgment of the Superior Court.

# B

# Mediation and the MOU

As discussed *supra*, following our grant of Champlin's petitions for writs of certiorari, Champlin's and the CRMC engaged in private mediation that ultimately resulted in the execution by those two parties of a Joint Memorandum of Understanding. On January 8, 2021, Champlin's and the CRMC filed a joint motion seeking "to incorporate and merge the Memorandum of Understanding * * * into a consent order of this Court." The intervenors and the attorney general opposed that motion, and we ultimately remanded the case to the Superior Court for findings of fact and conclusions of law concerning the "'propriety and conclusiveness' of the purported settlement and the validity of the MOU."

The Superior Court justice on remand conducted an extensive hearing over seven full days, during which thirteen witnesses testified. Subsequently, he made numerous findings of fact, all of which, we are satisfied, are supported by evidence in the record. Among those findings are the following.

On November 24, 2020, at a duly noticed meeting, the CRMC authorized its executive director, acting chair, and legal counsel to engage in mediation with Champlin's. On November 30, 2020, CRMC legal counsel sent an email to the solicitor for the Town of New Shoreham stating that the CRMC had "voted to participate in mediation * * * on the condition that the Town of New Shoreham also

participate." On December 3, 2020, the mediator called the town solicitor asking about the mediation, and he also emailed the town solicitor in an attempt to enlist the town in the mediation process. The town solicitor replied to both the mediator and the CRMC indicating that the town council would discuss the matter on December 7, 2020. The council did discuss the proposed mediation in executive session on December 7 and voted not to participate. The town solicitor notified both the CMRC and the mediator the following day.

Regrettably, the legal counsel for the intervenors had not been notified of the proposed mediation. It is clear, however, that he was well aware of it and had in fact argued against mediation at the town council meeting.

On December 15, 2020, Champlin's moved in the Supreme Court for additional time to file a statement of the case required by Rule 12A of the Supreme Court Rules of Appellate Procedure because Champlin's and the CRMC were engaged in mediation. On December 29, 2020, the CRMC discussed the MOU in executive session and then voted to ratify it in open session.

The remand justice thoroughly reviewed the testimony and credibility of each of the thirteen witnesses. He then framed his analysis by addressing three issues: (1) did the CRMC and Champlin's have authority to mediate; (2) what notice is required for mediation and was sufficient notice given; and (3) is the MOU a final decision.

As the remand justice correctly recognized, this Court is a strong proponent of alternative dispute resolution as a means of amicably settling cases. Most notably, Rule 35 of the Supreme Court Rules of Appellate Procedure establishes an Appellate Mediation Program, the purpose of which "is to afford a meaningful opportunity to the parties in all eligible civil appeals to achieve a resolution of their dispute in a timely manner as early in the appellate process as feasible[.]" Not infrequently, we have encouraged parties to mediate even after oral argument and offered the services of our Appellate Mediation Program to assist in that endeavor. So too, have we often exhorted parties to engage in meaningful settlement negotiations. *See Ryan v. Roman Catholic Bishop of Providence*, 941 A.2d 174, 186 (R.I. 2008) ("It is very much an important part of the policy of the courts of Rhode Island (and courts in general) to encourage the amicable settlement of disputes, whether by mediation or otherwise."); *Skaling v. Aetna Insurance Company*, 799 A.2d 997, 1012 (R.I. 2002) ("It is the policy of this state to encourage the settlement of controversies in lieu of litigation."); *Calise v. Hidden Valley Condominium Association, Inc.*, 773 A.2d 834, 839 (R.I. 2001) ("Our policy is always to encourage settlement. Voluntary settlement of disputes has long been favored by the courts." (quoting *Homar, Inc. v. North Farm Associates*, 445 A.2d 288, 290 (R.I. 1982))).

The threshold issue before this Court with respect to the MOU is whether Champlin's and the CRMC had the authority to mediate. This Court, in the context

of the cases currently before the Court on certiorari, is presented with a purported settlement agreement resulting from mediation between the CRMC and Champlin's that took place after the CRMC had already issued a final decision on Champlin's application and while the cases were pending before this Court.

The intervenors assert that the CRMC did not have authority to mediate with Champlin's because the matter was undergoing judicial review and had been transmitted from the CRMC to the Superior Court and then docketed in this Court on certiorari; therefore, the intervenors submit, the CRMC lacked the power "to add or subtract from the record, or alter or amend its findings and conclusions, while the final order is on appeal."

The attorney general, also an intervenor, argues that both the CRMC regulations and the APA "preclude settlement on appeal where the council has denied an application" and that the remand justice erred in finding that the MOU was a proper exercise of the CRMC's authority. The attorney general additionally takes issue with the remand justice's finding that the role of an administrative agency changes when the agency's decision is contested; instead, the attorney general contends that an administrative agency is not similarly situated to a private or public litigant in a civil lawsuit, and therefore cannot engage in litigation "in whatever manner it deems fit."

In response, Champlin's and the CRMC both assert that they had the authority to mediate. They contend that the remand justice did not err in determining that the role of an administrative agency *changes* after a final decision of the agency is issued and an appeal has been taken from that final decision. The CRMC additionally submits that the remand justice was correct in determining that § 46-23-20 gives the CRMC the authority to participate in mediation.

We begin our analysis by addressing the remand justice's determination that "[t]he role of [an] administrative agency changes after the final agency decision is issued"—"from that of [a] quasi-judicial authority to that of [an] advocate for the agency ruling[.]" Based on an application of that reasoning, the remand justice found that the CRMC was "subject to the same rules as other litigants" and that, therefore, the "CRMC and Champlin's, as two parties, could enter settlement discussions and proceed to mediation." He further found that the "CRMC was not acting as an agency or as an adjudicator when it participated in the mediation."

This Court has said that "[t]he scope of review of this [C]ourt, like that of the Superior Court, is an *extension of the administrative process*." *Environmental Scientific Corporation v. Durfee*, 621 A.2d 200, 208 (R.I. 1993) (emphasis added); *see generally* § 42-35-15 (APA section governing "Judicial review of contested cases"); § 42-35-16 (APA section governing "Review by supreme court").

- 45 -

Additionally, we have made clear that an administrative agency is not a normal litigant:

> "[A] governmental official, agency, commission, or board [is] charged with the responsibility of administering a particular set of rules and regulations designed to promote the public safety and welfare acts for the people and, as such, must be permitted *to represent the people* when a matter of public interest is involved." *Newman-Crosby Steel, Inc. v. Fascio*, 423 A.2d 1162, 1165 (R.I. 1980) (emphasis added).

In its enabling legislation, the General Assembly directed the CRMC "to exercise effectively its responsibilities in the coastal zone through the development and implementation of management programs to achieve wise use of the land and water resources of the coastal zone." Section 46-23-1(b)(1). That section also provides:

> "Furthermore, that implementation of these policies [to preserve, protect, develop, and, where possible, restore the coastal resources of the state] is necessary in order to secure the rights of *the people of Rhode Island* to the use and enjoyment of the natural resources of the state with due regard for the preservation of their values, and in order to allow the general assembly to fulfill its duty to provide for the conservation of the air, land, water, plant, animal, mineral, and other natural resources of the state, and to adopt all means necessary and proper by law to protect the natural environment of the people of the state by providing adequate resource planning for the control and regulation of the use of the natural resources of the state and for the preservation, regeneration, and restoration of the natural environment of the state." Section 46-23-1(b)(2) (emphasis added).

Neither the remand justice, the CRMC, nor Champlin's cite to any caselaw or statutory law that supports the notion that the CRMC's responsibilities to the public end at the point a contested agency decision results in litigation before our court system.

The remand justice was correct in stating that, on appeal, an administrative agency is "an advocate for the agency ruling." However, we find no support in our jurisprudence for the proposition that an administrative agency can, under any circumstance, act not as an agency but merely as a litigant. An administrative agency's statutory and regulatory responsibilities do not end when its final decision is appealed; rather, an agency's advocacy on appeal is in furtherance of the administrative process. *See Environmental Scientific Corporation*, 621 A.2d at 208. The CRMC therefore continues to be bound by the APA, its enabling legislation, and its regulations—the CRMC's duty to the people of Rhode Island does not end when it becomes a party to litigation that involves the propriety of one of its decisions.

We turn next to the issue of whether the CRMC had the authority to engage in mediation. The remand justice found explicit statutory authority for the CRMC "to mediate or otherwise resolve contested cases" in § 46-23-20, which provides:

> "All contested cases, all contested enforcement proceedings, and all contested administrative fines shall be heard by the administrative hearing officers, or by subcommittees as provided in § 46-23-20.1, pursuant to

the regulations promulgated by the council; provided, however, that no proceeding and hearing prior to the appointment of the hearing officers shall be subject to the provisions of this section. Notwithstanding the foregoing, the commissioner of coastal resources management shall be authorized, in his or her discretion, to resolve contested licensing and enforcement proceedings through informal disposition pursuant to regulations promulgated by the council."

He then looked to the CRMC regulations, specifically 650 RICR 10-00-1.8, which states:

"C. Modification of Assents and Final Decisions

"1. At any time prior to the expiration of an Assent, the full Council by majority vote may, based upon the evidence presented to it, modify an Assent. The City or Town Clerk and the local building official in the community shall be notified of the modification.

"2. The Council authorizes the Executive Director in his discretion to modify an Assent or final decision of the Council when the requested modification is consistent with the prior approval of the Council and the applicant and staff review have clearly demonstrated to the Executive Director's satisfaction that the project's overall impact to the State's coastal resources will be less than or equal to the existing Assent or decision."

The trial justice indicated that "[a]lthough no assent ever issued here, the statute and regulation demonstrate that settlement is favored. Of course, there was no clear authority provided to this Court to suggest that mediation is prohibited."

- 48 -

The APA states, as a general rule, that, "[u]nless precluded by law, informal disposition may be made of any contested case by stipulation, agreed settlement, consent order, or default." Section 42-35-9(d). Pursuant to § 46-23-20, however, "the commissioner of [the CRMC is] authorized, in his or her discretion, to resolve contested licensing and enforcement proceedings through informal disposition *pursuant to regulations promulgated by the council*." (Emphasis added.)

The issue before us is therefore governed not by § 42-35-9(d) but rather by § 46-23-20 and, more specifically, the CRMC's regulations. *See City of Woonsocket v. RISE Prep Mayoral Academy*, 251 A.3d 495, 501 (R.I. 2021) (noting that "it is a 'general rule of statutory construction that when a statute of general application conflicts with a statute that specifically deals with a special subject matter, and when the two statutes cannot be construed harmoniously together, the special statute prevails over the statute of general application'" (deletion omitted) (quoting *Whitehouse v. Moran*, 808 A.2d 626, 629-30 (R.I. 2002))). The CRMC "is bound, of course, by its own regulations." *Town of Burrillville v. Pascoag Apartment Associates, LLC*, 950 A.2d 435, 451 (R.I. 2008) (quoting *Arnold*, 941 A.2d at 821 n.2); *see also Ratcliffe v. Coastal Resources Management Counsel*, 584 A.2d 1107, 1110 (R.I. 1991). "It is a 'simple but fundamental rule of administrative law' that an 'agency must set forth clearly the grounds on which it acted.'" *Town of*

*Burrillville*, 950 A.2d at 451 (quoting *Atchison, Topeka & Santa Fe Railway Co. v. Wichita Board of Trade*, 412 U.S. 800, 807 (1973)).

In the case at bar, this Court is presented with a purported settlement agreement resulting from mediation between the CRMC, a state agency, and Champlin's, an applicant, that took place *after* the CRMC had already issued a final decision on Champlin's application.

The MOU, in effect, modifies the CRMC's May 6, 2011 final decision. The CRMC *denied* Champlin's application in its decision; it has now mediated with Champlin's and agreed to what appears to be a modification of Champlin's application.

Our review of the CRMC's regulations reveals only one avenue for the CRMC to modify a final decision:

> "The Council authorizes the Executive Director in his discretion to modify an Assent or final decision of the Council when the requested modification is consistent with the *prior approval of the Council* and the applicant and staff review have clearly demonstrated to the Executive Director's satisfaction that the project's overall impact to the State's coastal resources will be less than or equal to the existing Assent or decision." 650 RICR 10-00-1.8(C)(2).

When interpreting a regulation, we employ the same rules of construction that we apply when interpreting a statute. *See Murphy v. Zoning Board of Review of Town of South Kingstown*, 959 A.2d 535, 541 (R.I. 2008) ("The construction of a

- 50 -

regulation is a question of law to be determined by the court. The principles or rules of statutory construction apply to administrative regulations." (quoting 2 Am. Jur. 2d *Administrative Law* § 245 at 221 (2004))). Thus, "[i]f the [regulation] is clear and unambiguous, we must enforce it as written by giving the words of the [regulation] their plain and ordinary meaning." *Id.* (quoting *Ruggiero v. City of Providence*, 893 A.2d 235, 237 (R.I. 2006)).

A plain reading of 650 RICR 10-00-1.8(C)(2) indicates that, in order to modify a final decision, the CRMC must have *granted* the application and issued an "assent." 650 RICR 10-00-1.8(C)(2). In the case at bar, Champlin's application was *denied* by the CRMC in the final decision dated May 6, 2011. Because Champlin's application was *denied*, pursuant to 650 RICR 10-00-1.8(C)(2), the CRMC did not have the authority to modify the final decision. Although the remand justice was correct in indicating that "there was no clear authority * * * to suggest that mediation is prohibited[,]" the plain language of 650 RICR 10-00-1.8(C)(2) requires that an application be granted in order for a final decision or assent to be modified. *See Murphy*, 959 A.2d at 541.

Certainly, "[a]dministrative agencies retain broad enforcement discretion and, as always, considerable deference is accorded to such agencies about how to enforce

- 51 -

regulations[,]" *Arnold*, 941 A.2d at 820-21; however, here, *no* such applicable regulation exists.[12]

We additionally do not find any regulation permitting a post-final-decision settlement to be discussed in an executive session and then approved in an open session. Indeed, the CRMC's regulations appear to favor the opposite:

> "The Council finds that an *open, traceable decision-making process* is *essential* for an effective coastal management program, and where required should be done in an open transparent public forum. The Council will therefore follow the procedures set forth in the Coastal Resources Management Program, including applicable Special Area Management Plans, for all permit applications which, by regulation come before it." 650 RICR 20-00-1.5(A)(4) (emphasis added).

We are also of the conviction that the MOU falters for a more fundamental reason. Under its terms, the MOU "shall serve as the CRMC's [d]ecision relative to this matter." Indeed, the MOU contemplates the issuance by the CRMC of an Assent, which Assent shall "flow" from the MOU and be "subject to the terms" of

---

[12] We note that Champlin's reliance on *Town of Richmond v. Rhode Island Department of Environmental Management*, 941 A.2d 151 (R.I. 2008), is misplaced. In that case, this Court indicated that § 11(f) of the Department of Environmental Management Rules and Regulations for Assessment of Administrative Penalties "explicitly provide[d] that 'nothing herein shall preclude the Director from resolving the outstanding penalty through a Consent Agreement at *any time* he or she deems appropriate.'" *Town of Richmond*, 941 A.2d at 157 (emphasis added) (brackets omitted). The *only* analogous rule in the CRMC's regulations concerns applications for freshwater wetlands permits exclusively. *See* 650 RICR 20-00-9.15.4 (the CRMC's rule concerning consent agreements with regard to freshwater wetlands permits).

the MOU. We are satisfied, therefore, that the MOU is intended to constitute the final decision on Champlin's application, and as such, it fails to comport with the CRMC's regulations and the APA in that it is devoid of any findings of fact with respect to the requirements that applicants must satisfy under CRMP § 300.1. *See* § 42-35-12 ("Any final order shall include findings of fact and conclusions of law, separately stated.").

This is particularly disconcerting in light of the factual findings that the CRMC did make in its May 6, 2011 decision, several of which indicated that Champlin's had failed to meet its burden with respect to the regulatory requirements. "An administrative decision that fails to include findings of fact required by statute cannot be upheld." *Sakonnet Rogers, Inc. v. Coastal Resources Management Council*, 536 A.2d 893, 896 (R.I. 1988).

We therefore hold that the remand justice erred in determining that the CRMC and Champlin's had authority to mediate. Accordingly, we decline to incorporate and merge the MOU into a consent order of this Court.[13]

---

[13] Because we have determined that the CRMC did not have the authority to mediate with Champlin's, we need not reach the additional issues raised by the intervenors and the attorney general with respect to the propriety of the MOU and the remand justice's decision with respect to the same.

# IV

## Conclusion

For the reasons set forth herein, we affirm the decision and resulting June 17, 2020 judgment of the Superior Court; and we deny the request by Champlin's and the CRMC to incorporate and merge the MOU into a consent order of the Supreme Court. The record may be returned to the Superior Court with our decision endorsed thereon.

Justice Goldberg did not participate.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Champlin's Realty Associates v. Coastal Resources Management Council et al. |
| **Case Number** | No. 2020-168-M.P. (WC 11-615) <br><br> No. 2020-169-M.P. (WC 11-616) |
| **Date Opinion Filed** | October 14, 2022 |
| **Justices** | Suttell, C.J., Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Washington County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Kristin E. Rodgers <br> Associate Justice Jeffrey A. Lanphear |
| **Attorney(s) on Appeal** | For Plaintiff: <br><br> Robert D. Goldberg, Esq. |
| | For Defendants: <br><br> Anthony DeSisto, Esq. <br> R. Daniel Prentiss, Esq. <br> Sara Rice, Department of Attorney General |